FILED

MAR 28 2013

[signature]
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| CAROL E. HESLA, | * | CIV. 12-4033 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | |
| | * | **MEMORANDUM OPINION** |
| | * | **AND ORDER** |
| CAROLYN COLVIN[1], | * | |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff, Carol E. Hesla ("Hesla") seeks judicial review of the Commissioner's final decision denying her a period of disability commencing on June 15, 1951, and payment of disability insurance and medical benefits under Title II of the Social Security Act.[2] Hesla has filed a Complaint and has requested the Court to enter an order instructing the Commissioner to award benefits. The matter is fully briefed and ripe for a decision.

---

[1]Pursuant to 42 U.S.C. 405(g), Carolyn Colvin has been substituted for Michael Astrue as the named Defendant. Ms. Colvin became the acting Commissioner of the Social Security Administration on February 14, 2013.

[2]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon her "coverage" status. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, because Hesla is claiming entitlement to Child's Disability benefits her "coverage status" expired on June 16, 1973 which was her twenty-second birthday. It appears Hesla previously filed for SSI benefits but her claim was denied based on her financial situation. AR 1169, 2915, 2917, 2920. Although her previous SSI claims are mentioned, no documentation for Hesla's previous SSI claims are contained in the present record.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g).

## ADMINISTRATIVE PROCEEDINGS

Hesla protectively filed an application for Child's Insurance Benefits (CIB) under Title II of the Social Security Act, 42 U.S.C. § 402(d), on January 27, 2009. AR 131-137, 141. The Commissioner denied her claim initially on May 8, 2009 (AR 61) and on reconsideration on July 2, 2009 (AR 70-71). Hesla requested and received a hearing before an Administrative Law Judge ("ALJ"). AR 74-75. The hearing was held on October 21, 2010 before the Honorable John D. Sullivan. AR 27-57. On November 15, 2010, the ALJ issued a written decision affirming the previous denials. AR 13-19.    On January 4, 2011, Hesla requested review by the Appeals Council. AR 9. On January 11, 2012, the Appeals Council issued its decision which disagreed with the ALJ on one issue, but nevertheless affirmed his determination that Hesla is not entitled to Child's Disability benefits under Title II of the Act. AR 1-7. Hesla timely appealed to the District Court.

## STATUTORY REQUIREMENTS

Hesla applies for Child's Insurance Benefits (CIB)  under 42 U.S.C. § 402(d)(1)(B)(I). Pursuant to that statute, an adult child may collect disability benefits based upon the earnings record of an individual who is entitled to old age or disability insurance benefits. In general, a claimant over the age of 18 is entitled to CIB on the earnings record of an insured person if the claimant (1) applies for CIB; (2) is the child of the insured person; (3) was dependent on the insured person; (4) is not married; and (5) is under a disability as defined by the Act which began before she became twenty-two years of age. *See, id.;* 20 C.F.R. 404.350.   The definition of "disability" for purposes of CIB benefits is the same as for adult disability benefits and is found at 42 U.S.C. § 423(d)(1)(A):

> **(d) "Disability" defined**
> **(1)** the term "disability" means–
> **(A)** inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can    be expected to result in death or which has lasted or can be    expected to last for a continuos period of not less than 12 months...

To be entitled to CIB, Hesla must make two showings: that she was disabled on or before her twenty-

second birthday, and that she was continuously disabled from that date until the date of her application. *Miller v. Shalala*, 859 F.Supp. 297, 300 (S.D. Ohio 1994). "This 'continuos disability' interpretation of the statute appears to be a long-standing policy of the Secretary, and it has been accepted as an appropriate interpretation by numerous courts of appeal." *Id.* The Eighth Circuit is among the Courts that have adopted the "continuos disability" interpretation. *Anderson v. Heckler*, 726 F.2d 455 (8th Cir. 1984).[3]

## **FACTS**

### 1.    **Biographical Information**

Carol Ranney Hesla ("Hesla") was born in 1951 and is currently sixty-one years old. She is the youngest of three children. Her father is a retired physician and her mother died in 1979 when Hesla was twenty-eight years old. Carol has two older brothers : David, (eight years older than Hesla) is a retired physician who lives in Texas. Robert (ten years older than Hesla) is a pharmacist who lives in Nebraska. Hesla graduated from Yankton High school in 1969. She ranked 135 out of 214 in her class, earning mostly Bs and Cs with an occasional A and D. She briefly attended Cottey College in Nevada, Missouri, Augustana College in Sioux Falls, South Dakota, and the New England Conservatory of Music Boston Massachusetts. She obtained a Bachelor's Degree in Music from Yankton College in Yankton, South Dakota in December, 1973.[4] She later (in 1977-78) returned to Yankton College to earn a teaching certificate. She briefly attended the University of South Dakota in an attempt to obtain a dental hygiene certification, but dropped out of that program. She has held various part-time jobs but has never earned enough to amount to substantial gainful employment. She married Greg Hesla in March, 1986. They were divorced in March, 1992. Together they had a daughter who was born in July, 1988.

---

[3]  Hesla's application claimed as the conditions which rendered her disabled: learning disability, asthma, bronchitis, irritable bowel syndrome, depression, anxiousness and back problems. AR 145.    The parties agree that the focus of Hesla's disability claim has become the psychological component of her difficulties; namely her depression, personality and anxiety disorders.

[4]Hesla's school transcripts (grade school through college) are contained in the record at AR 309-323.

## 2.    Medical Information

Because Hesla must prove she was disabled on or before the date of her twenty-second birthday (June, 1973) the most crucial time period in this case is between the date of Hesla's birth (June 1951) through June, 1973.   The medical records for that period of time, however, are sparse and irrelevant to her claim.   They consist solely of Hesla's childhood vaccination records, a surgical record for the removal of her appendix at age eleven, and other typical juvenile medical records depicting ailments such as cold and flu symptoms.

Hesla  bases her claim on the retrospective diagnosis provided by her physician and the lay testimony provided by family and friends.   "Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability. . .  Where the impairment onset date is critical, however, retrospective medical opinions alone will usually not suffice unless the claimed disability date is corroborated, as by subjective evidence from lay observers like family members."  *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995) (citation omitted).   Also,

> in a case involving a degenerative disease . . .where a claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and the diagnosis of her doctor. . .If the treating doctor's retrospective diagnosis is based on medically accepted clinical diagnostic technique, then it must be considered in light of the entire record to determine whether it establishes the existence of a physical impairment prior to the expiration of the claimant's insured status.  A treating physician's opinion is generally entitled to substantial weight; however such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable or diagnostic data.

*Grebnick v. Chater*, 121 F.3d 1193, 1199 (8th Cir. 1997) (citations omitted).

The retrospective medical opinion, along with the lay testimony and the "record as a whole" are reviewed to determine whether Hesla became disabled before her twenty-second birthday and was continuously disabled until the date of her application for CIB.   *Grebnick, Id.; Anderson v. Heckler*, 726 F.2d 455 (8th Cir. 1984).

4

### A.     Hesla's 1984 Mental Health Treatment

The first record of Hesla's treatment for mental health issues appears in October, 1984, when Hesla was thirty-three years old.  At that time, Hesla was hospitalized at McKennan Hospital for "depression."  AR 4386.[5]  The records indicate Hesla had been "under the care" of psychiatrist Dr. Arbes but do not indicate the length of his treatment.  Dr. Arbes's treatment notes are not in the administrative record.  It is unknown whether Hesla continued to treat with Dr. Arbes following the 1984 hospitalization.

### B.     Post-1984 Medical and Mental Health Treatment

Hesla visited her family doctor at the Yankton Medical Clinic in September, 1985, for a throat infection.  AR 4531.  He noted that at that time her panic disorder was "controlled by medication" (Nardil).[6]   Hesla was seen at Sacred Heart Hospital in Yankton in October, 1985 for urinary retention.  AR 4800-4801.  She was then taking Nardil.   The physician noted "she has had anxiety and depression in the last two years since her mother died.  She is seeing psychologist for anxiety. The last time she saw one was in August 1985."  AR4800.    Similarly in September, 1985 her physician noted that Nardil "prevents PANIC doesn't cause urine retention, allows CR to function and cope with life." AR 4821.

The next medical records of significance are related to Hesla's pregnancy and delivery by Caesarean section in July, 1988.  AR 4853-4856.  Hesla continued to receive care at the Yankton Medical Clinic after her child was born.  She complained of various problems such a sore throat (AR 4505), leg pain (AR 4506) and back pain (AR 4509).  There is little or no record, however that Hesla complained of anxiety or depression between 1985 and 1991, when she was again hospitalized.

### C.     1991 Charter Hospital Inpatient Hospitalizations

Hesla was an inpatient at Charter Hospital in May and December, 1991.  Although she told

---

[5]The administrative record in this case is sixteen volumes and contains 8,196 pages.

[6]Nardil is a MAO inhibitor.  It is indicated for depressed patients who are described as "atypical" and who have mixed anxiety and depression features. www.rxlist.com.

the physician that she was "unable to remember any day in her life" without fears (AR 1694) she also indicated "some of her problems were manageable" before December, 1990 when the problems in her marriage became overwhelming. AR 1694. Hesla separated from her husband after her May, 1991 Charter inpatient hospitalization. Her divorce was final in March, 1992, shortly after her second Charter inpatient hospitalization ended in January, 1992. Dr. David Bean treated Hesla during the second Charter inpatient hospitalization. In a psychiatric evaluation dated December 2, 1991, Dr. Bean noted Hesla had "always felt shy and timid and fearful of interpersonal relationships, both within the family and in the school setting. She had difficulty in school, although she did obtain a Bachelor's degree in music and has a teaching certificate. Psychological testing at last hospitalization indicated IQ ranges in the mid 80's which is remarkable with her past history of school achievement." AR 1445. He also noted Hesla's "longstanding avoidant and dependent personality traits" as well as "history of chronic anxiety and feelings and history of panic attacks and phobias . . ." AR 1446. Nevertheless, Dr. Bean's evaluation concluded that Hesla's GAF Score was currently 35, but was 90 one year ago in December, 1990. AR 1447.[7]

### D. Post-1991 Mental Health Treatment

Although the medical records pre-dating Hesla's alleged date of onset are sparse, the records which post-date her 1984 and 1991 inpatient hospitalizations are voluminous. They represent the majority of the over 8,000 page administrative record. Hesla's mental health treatment is best summarized in Dr. Bean's August 11, 2010 evaluation which is contained at AR 221-254. Dr. Bean's summary of Hesla's treatment is found at AR 225-234. Dr. Bean noted Hesla's 1984 and 1991

---

[7]GAF stands for Global Assessment of Functioning. Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th Ed. 1994) The GAF score is indicated on Axis V of the DSM III diagnosis. A GAF Score of 31-40 indicates "some impairment in reality testing or communication (e.g. speech is at times illogical, obscure or irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

A GAF of 90 indicates "absent or minimal symptoms (e.g. mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g. an occasional argument with family members).

hospitalizations.  Additionally, Dr. Bean noted the following:

- Inpatient hospitalization, Charter Hospital, June, 1993
- Inpatient hospitalization, McKennan Hospital, August, 1993
- Inpatient hospitalization, Charter Hospital, June, 1994
- Inpatient hospitalization, Charter Hospital, October, 1994
- Inpatient hospitalization, Charter Hospital, February, 1995
- Inpatient hospitalization, Charter Hospital, March, 1995
- Inpatient hospitalization, Charter Hospital, May, 1995
- Inpatient hospitalization, Charter Hospital, October, 1996
- Inpatient hospitalization, McKennan Hospital, November, 1999
- Inpatient hospitalization, Human Services Center, October, 2004
- Inpatient hospitalization, Human Services Center, November, 2004
- Inpatient hospitalization, McKennan Hospital, November, 2008
- Inpatient hospitalization, McKennan Hospital, November, 2008 (second time in 11/08)
- Inpatient hospitalization, McKennan Hospital, February, 2009
- Inpatient hospitalization, McKennan Hospital, May, 2009

Dr. Bean noted that at discharge from the above hospitalizations, Hesla was repeatedly diagnosed with major depression, and generalized anxiety disorder.  Her other diagnoses included at various times:

- mixed personality disorder with avoidant, dependent and obsessive compulsive traits
- post-traumatic stress disorder
- panic disorder
- mental retardation
- history of dysthymia
- eating disorder not otherwise specified
- borderline avoidant and histrionic traits
- borderline intellectual functioning
- ADHD,
- schizotypical and borderline traits
- ADD
- Depression NOS improved
- personality disorder NOS with borderline and dependent traits
- dependent personality disorder
- sociophobia severe
- panic disorder with agoraphobia
- undifferentiated somataform disorder
- borderline IQ

In addition to her hospitalizations, Hesla received psychotherapy from Dr. Arbes in 1984 but

his records were not available. AR 225. Hesla received individual counseling from Bruce Johnston (Psychiatry Associates, Sioux Falls, SD) in 1993-1994 and "intensive psychotherapeutic activities" under the care of Dr. Bandettini in Sioux Falls in 1994-95. AR 229.   Dr. Bandettini continued to treat Hesla though an outpatient program in Yankton into 1996-97. Hesla received outpatient psychiatry treatment for several years (through 2010) from Dr. Alan Brevik at the Lewis & Clark Mental Health Center in Yankton, South Dakota. Dr. Bean was Hesla's treating psychiatrist for her 1999, 2008 and 2009 McKennan Hospital inpatient hospitalizations.

### 3.   Expert Opinions

The record contains several expert opinions.

**A. Dr. David Bean.**   Dr. Bean prepared a lengthy "Social Security Psychiatric Evaluation" dated August 22, 2010. AR 221-254. He reviewed several sources of information including Hesla's past medical records, the affidavits of her friends and family, her academic records, and earning records. Dr. Bean also interviewed Hesla and her father. The "Summary" portion of Dr. Bean's evaluation begins on page twenty-nine of his thirty-four page report. AR 249. Dr. Bean explains that "while her psychiatric treatment has only been during her adult years, her pre adult childhood history is replete with history of childhood anxiety and developing personality disorder symptoms of the avoidant and dependent type." AR 250. He noted Hesla's description of "youthful sociophobic phenomenon of being 'petrified' of any school class [that] required performance activities, extreme shyness in peer group interpersonal relations, and strong feelings of isolation from peer groups except for a few individuals who were particularly kind to her as a child and adolescent." AR 250. Dr. Bean concluded:

> The significant family striving for intellectual achievement accomplished by her two older brothers and her father and the care and mentoring of her mother to overcome her cognitive inadequacies have resulted in an individual who from an early age has experienced childhood anxiety with avoidant and dependent personality development.

> Ms. Hesla's childhood and adolescent psychiatric symptomology background present throughout her childhood, adolescent, and early adult years was brought to a level of catastrophe by the death of her overly conscientious mother at Ms. Hesla's age of 28 years.   This loss of her mother's support and protection later set forth the development of the various adult psychiatric disorders that Ms. Hesla has experienced since her first psychotherapy/psychiatric treatment in 1984 up to her current age.

8

In retrospect, diagnostically she has experienced both childhood and adolescent General Anxiety Disorder, Adolescent Social Anxiety Disorder, and persistent Avoidant and Dependent Personality Disorders, all of which have persisted into adulthood. In adulthood she later developed prolonged episodes of Posttraumatic Stress Disorder and chronic, recurring Major Depressive Disorder, which, along with her Chronic General Anxiety Disorder, have been the major components of her history of adult psychiatric treatment.

**B.    Dr. Michael McGrath.**    Dr. McGrath prepared a "Neuropsychological Evaluation" dated May 6, 2010. AR 286-295. The purpose of the evaluation was to assess Hesla's cognitive and psychological functioning. Dr. McGrath interviewed Hesla and reviewed the report of Margaret Tidd. Dr. McGrath's testing suggested her cognitive impairment is "secondary to anxiety and depression, rather than being organically based." AR 292. Dr. McGrath concluded:

Mrs. Hesla has chronically functioned at a marginal level, as revealed by interview material and the summary provided by Dr. Tidd. She apparently was exposed to maladaptive parenting(controlling, perhaps abusive father; 'enabling' mother), which likely played an important role in shaping her maladaptive psychological features. Her birth history of being a 'blue baby' also raises the possibility of anoxia at birth, which may have adversely affected her cognitive potential later in life. Note that the current IQ scores may actually represent her chronic level of functioning due to the fact that the premorbid estimates may be overestimates of ability. She likely has been chronically subject to considerable anxiety and depression, which also can adversely affect her cognitive functioning. Given the history of dysphoria, along with the personality disorder and consequent cognitive impairment, it is not at all surprising that she has never been able to maintain meaningful employment. Though she is receiving psychiatric and psychological treatment, her maladaptive personality features are unlikely to change to a significant degree and one can anticipate at least ongoing episodic dysphoria. Prognosis for substantial improvement in her global assessment of functioning is poor. Clearly, she will need ongoing psychiatric and psychological treatment and likely also should be involved in support groups.

**C. Richard Ostrander.**   Mr. Ostrander is a vocational expert. He submitted a report dated October 7, 2010. He interviewed Ms. Hesla and reviewed the reports of Margaret Tidd, Dr. McGrath, and Dr. Bean. He also reviewed the affidavit of Hesla's brother, Dr. David Ranney. AR 296. Mr. Ostrander stated:

The degree of dysfunction described by Ms. Hesla as a result of her anxiety disorder, would have prevented her from maintaining employment on a regular basis in any

capacity at any time throughout her adult life. This disorder has kept her from attending work on a consistent and regular basis. Given the level of dysfunction which she described and which has been confirmed in diagnoses by Dr. McGrath, Dr. Tidd and Dr. Bean, she would not be capable of functioning or attending on a regular basis, to any employment in significant numbers in the regional or national economy.

Likewise based on the diagnosis identified by Dr. Tidd and Dr. Bean, Ms. Hesla would have been unable to maintain regular employment at any point throughout her life. Of significance is both childhood and adolescent general anxiety disorder, adolescent social anxiety disorder and persistent avoidant and dependent personality disorders, all of which Dr. Bean has identified as persisting into adulthood. The combination of anxiety and her avoidant and dependent personality disorders would prevent her from attending to work on a regular basis in a manner consistent with competitive employment.

AR 303.

### D. Dr. Jerry Buchkoski–Psychiatric Review Technique

On May 7, 2009, Dr. Jerry Buchkoski performed the Psychiatric Review Technique as required by 20 C.F.R. § 404.1520a at the request of the State Agency. AR 324-336. Dr. Buchkoski evaluated Hesla under the "Listings" for mental disorders (12.02-Organic Mental Disorders; 12.03-Schizophrenic, Paranoid and other Psychotic Disorders; 12.04-Affective Disorders; 12.05-Mental Retardation; 12.06-Anxiety Related Disorders; 12.07-Somataform Disorders; 12.08-Personality Disorders; 12.09-Substance Addiction Disorders; 12.10-Autism and other Pervasive Developmental Disorders), but found that as of the date of his evaluation, there was insufficient evidence to conclude that Hesla was disabled by any of them prior to June, 1973, when she reached the age of twenty-two. AR 336.

### 4.    Lay Evidence

In addition to the expert opinions, several of Hesla's friends, family and acquaintances submitted written summaries and/or affidavits regarding their recollections of her throughout the years.

**A. Dr. Alden "Brooks" Ranney.** Brooks Ranney is Hesla's father and the person upon whose earnings record Hesla seeks to collect benefits. Dr. Ranney was ninety-five years old at the time of the administrative hearing in the matter. AR 52. He was a physician and specialized

in gynecology. He retired at age eighty. *Id.* Dr. Ranney submitted an undated[8] document entitled "Past Medical History of Carol Ranney Hesla" which appears at AR 5960-5961. The document appears to be a chronological medical history. After the death of her mother in 1979, Dr. Ranney noted Hesla was "subject to anxiety." AR 5960. After the birth of her daughter in 1988, Dr. Ranney noted Hesla suffered from "rather severe post partum depression, which probably was the immediate cause of divorce around 1993. . ." *Id.* After the divorce, Hesla moved to Sioux Falls. "Symptoms of depression became worse." As of the date Dr. Ranney wrote the summary he believed "now her depression is much worse." AR 5961.

The other two documents written by Dr. Ranney (AR 268-269 and AR 400) are undated but it can be deduced from date references they were written sometime in 2009. In the one page document (AR 400) Dr. Ranney explains that Hesla was cyanotic for an unknown period of time when she born by Cesarean section in 1951. Hesla's mother helped her a great deal with her homework throughout her school years. Hesla has never maintained a regular job but has enjoyed teaching young children and volunteering. AR 400. Her divorce "precipitated severe depression for some years." *Id.* In a two page letter to "Celia" Dr. Ranney expanded upon the thoughts previously expressed in the one page document. AR 268-69. Dr. Ranney further explained that his wife was "often up beyond midnight trying to help [Hesla] with her educational projects." AR 268. He also again emphasized that "Carol had taken [her mother's] death very hard" and "had always had some tendency toward depression ever since [her mother's] death. This was aggravated by Carol's pregnancy and was much worse during her post partum healing after the Section." AR 268. He further explained after Hesla's divorce "Carol's depression got worse." *Id.*

**B. Dr. David Ranney.** David Ranney is Hesla's brother. He is eight years older than Hesla. He submitted an affidavit (AR 270-272) regarding his observations of Hesla during their childhood. Dr. Ranney is a retired pathologist. Dr. Ranney believes Hesla "suffers from significant left-brain mental dysfunctions and apparently has so since birth." AR 270. He has observed her

---

[8]The writing is hard to read but it appears the document may be dated "20 Nov. 08" on the second page. AR 5961.

"suffer progressively and continuously" from generalized anxiety since she was six or eight years old. "It has continuously impaired her ability to socialize with peers, teachers and superiors with whom she is not already intimately familiar and friendly. I have often observed her distress to escalate into full blown panic attacks. It clearly impairs her ability to work with the public and to obtain and retain employment." *Id.* Dr. Ranney described Hesla as "pathologically shy" during childhood. He, like his father described "extensive daily tutoring" Hesla received from their mother which he believed helped her graduate from high school and college. AR 271. He concluded:

> The psychological and psychiatric symptoms described above have been plaguing Carol from at least the age of 6 or 8, when she was old enough for me to reliably observe them in her daily life; and it is very probable that the underlying cognitive and brain disabilities have been present since birth. In my personal and professional opinion, it is highly unlikely after these may decades of disability, that she could be expected to undergo a sufficient recovery and rehabilitation to function normally in her everyday life tasks, or to obtain regular, remunerative employment.

**C. Robert Ranney.** Robert Ranney is Hesla's brother. He is ten years older than Hesla. He submitted an affidavit (AR 274-75) regarding his observations of Hesla during their childhood. He described her as "painfully shy and excessively anxious." AR 273. He observed "she couldn't concentrate on anything." *Id.* He described her as "excessively dependent on others" throughout her life. He described Hesla's mother as "quite involved" in Hesla's academics. *Id.* He observed that Hesla's "anxiety issues have always interfered with her ability to hold down employment. During those infrequent times when Carol has been able to acquire some type of employment, her anxiety-related issues would keep her from being able to handle the job. For instance, when Carol was roughly 28, she became employed by a Montessori school in Omaha, Nebraska where I was living at the time. I observed that Carol was unable to handle that program, suffering great anxiety and unreasonable stress over simple things such as how to get to and from the school. Not surprisingly, the term of her employment there was very short." AR 274.

**D. Margaret Tidd.** Dr. Tidd is a Child Psychiatrist who practices in Ridgeland, Mississippi. She has not treated Carol Hesla, but Dr. Tidd and Carol Hesla were childhood friends. AR 182. There are several submissions in the record from Dr. Tidd. The first is entitled "Personal

12

Recollections of Carol Ranney Hesla" and is dated December 2, 2009, (revised June 15, 2010). AR 182-83. The next is entitled "Psychiatric History/Assessment" and is undated. AR 184-189. The next is entitled "Overview" and is likewise undated. AR 190-92. The next is a letter to attorney Ross Den Herder dated March 9, 2010. AR 196-198. Dr. Tidd also provided an article from the Journal of Child Psychology and Psychiatry. AR 200-220.

Dr. Tidd grew up in Yankton with Carol Ranney Hesla. Their fathers were both physicians and they attended the same church and school. Their families shared the same housekeeper. AR 182. As a young child, Dr. Tidd considered herself to be Hesla's self-appointed assistant, to help Hesla be "normal." *Id.* Dr. Tidd remembers Hesla has as very shy, quiet and socially awkward. Dr. Tidd spent practically every Friday night at Hesla's house during the fifth and sixth grades. Dr. Tidd remembers Hesla as needing an extraordinary amount of help with her clothes and hair, and that Hesla always wanted to copy Tidd. The other kids picked on Hesla because she was awkward. Tidd continued trying to help Hesla until age fourteen when Tidd's parents told Tidd she could quit helping Hesla. They drifted apart and only had intermittent contact after age fourteen.

Tidd remembers Hesla got along better with adults than people her own age, and preferred to play with young children rather than her own peers. AR 183. Tidd commented on the excessive help Hesla received from her mother with schoolwork: "She also had problems with schoolwork; her mother helped her and even acquired the books we used and did every lesson with her; she read every reading assignment. I was always puzzled by the need to do this–Carol often did not get good grades, but I was aware she wasn't 'stupid.'" AR 183. Hesla was very reliant on her mother . "I would think the loss of her mother must have been devastating for her, because she relied on her so much." *Id.*

Tidd saw Hesla in the summer of 2009 at their forty year class reunion. AR 183. "Her social awkwardness was more pronounced than I remember and she appeared to have symptoms consistent with Parkinsonism or perhaps pseudo parkinsonism–bradykinesia and a hand tremor and possibly some dyskinesia of her mouth. . . I am alarmed by her extra pyramidal symptoms (due to

13

Parkinsonism or medication side effect) at this time and when I saw her a year ago, I thought she had deteriorated markedly and wondered if there were even symptoms of early dementia. However, I had a good conversation with her on the phone recently and am somewhat reassured on that score." AR 183. In the Summary section of the document entitled "Psychiatric History/Assessment" Dr. Tidd concludes: "In my opinion, Carol's current disabilities clearly began in childhood and the manifestations which are apparent today are typical of the natural history of Pervasive Developmental Disorder and its common co-morbidities." AR 184.

    **E. Joan Loecker, Virginia Burgher, Kathleen Kreek.** Ms. Loecker (AR 275-76) is Hesla's childhood friend; Burgher (AR 265-66) and Kreek (AR 277-78) are college friends. They have each submitted affidavits regarding their observations of her. Loecker describes Hesla as "painfully shy, extremely timid and lacking any meaningful self confidence." AR 275. "I've always known her to be reluctant to engage in new activities of any sort because they may prove embarrassing. These anxieties have been debilitating for Carol." *Id.* Ms. Locker concludes: "I have observed that her anxieties interfere with her ability to hold down steady employment. Carol has always been mentally fragile. This has been the case for as long as I have known her." AR 276. Burgher met Hesla while attending Yankton College. AR 265. She described Hesla as "excessively quiet, shy and withdrawn." AR 265. She is "perpetually afraid of criticism and rejection" a condition which has "grown worse" since Burgher has known Hesla. *Id.* She described Hesla as "very needy" often soliciting advice and when she does not receive it, suffering from panic attacks. *Id.* Hesla left the dorm to move back home with her mother. *Id.* "She lacks any reasonable amount of confidence, which actually prevents her from taking on or completing . . .projects." AR 266. Burgher concluded: [T]he problems Carol has always suffered . . have greatly interfered with her ability to develop social relationships with others and have greatly interfered with her ability to obtain and maintain employment. Over the years, I have continuously observed that her symptoms . . would make her unable to work at any type job for more than just a brief period of time. Since I met her in college, this is who Carol is. I do not believe she is capable of improving. As it appears, these issues have only worsened over time." Kreek meet Hesla at Yankton College when Kreek was a freshman and Hesla was a senior. AR 277. They have maintained their friendship since then. Kreek described

14

Hesla as "painfully shy." She observed that in Hesla's early to mid-twenties, Hesla's anxiety interfered with her eating habits. "Her problems with anxiety have not improved, but rather have worsened since I have known Carol." *Id.* She believes that since she has known Hesla, Hesla has lacked everyday common sense. She observed that Hesla's mother "vigorously" helped her with her final year of college. *Id.* "Her symptoms have always been what I would characterize as disabling. I have observed that she simply is unable to function on her own in society, which includes an inability to hold down any meaningful employment." AR 278.

## DISCUSSION

### 1.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger,* 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically,

a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

## 2.     The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure[9] to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

> **Step One:**     Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.
>
> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes

---

[9]The statutory standard for determining disability for a CIB claim is the same standard used in adult disability claims. *Gann v. Astrue*, 2009 WL 1874077 (E.D. Tenn.) *citing Sullivan v. Zebley* 493 U.S. 521, 529, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The *Gann* Court applied the familiar five-step procedure recited above.

completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8ᵗʰ Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. §404.1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

### 3.    Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8ᵗʰ Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8ᵗʰ Cir. 2000); 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices. *" Brown v. Apfel*, 192 F.3d 492, 498 (5ᵗʰ Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7ᵗʰ Cir. 1987).

### 4.    The ALJ's Decision

The ALJ issued a seven page, single-spaced decision on November 15, 2010.  The ALJ determined Hesla has never engaged in substantial gainful employment, but did not have a medically determinable impairment on or before her twenty-second birthday.  As such, he determined at step two of the analysis that Hesla was not "disabled" and therefore not entitled to CIB benefits. [10]   In reaching this determination, the ALJ reasoned:

> In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment, the individual must be found not disabled at step 2 of the sequential evaluation process . . .
>
> Here the record reflects no actual and/or longitudinal treatment for the alleged impairments prior to . . . the date the claimant attained age 22.  This conclusion is supported by the testimony of the claimant's father that the claimant did not get psychological treatment when she was a child, reportedly because the mother was afraid of the stigma that would attach to the claimant . . .
>
> There must be testimony from an acceptable medical source in order to establish the existence of a medically determinable impairment that can reasonably be expected to produce the symptoms i.e. licensed physicians (M.D. or D.O) licensed or certified psychologists, . . .
>
> ***
>
> After the consultative examination from August 11, 2010, David W. Bean, M.D., psychiatrist, stated that in retrospect, the claimant experienced both childhood and adolescent General Anxiety Disorder, and persistent Avoidant and Dependent Personality Disorders, all of which have persisted into adulthood.  In reviewing Dr. Bean's report, however, the undersigned notes that his documentary review did not include any treatment records covering the relevant period under consideration.  Thus, his diagnostic opinion is afforded little weight.
>
> The record included affidavits from family members and friends as well as the opinion of a vocational consultant.  However, these opinions are not relevant in the analysis of establishing the existence of a medically determinative impairment.  Therefore, these opinions are given no weight.
>
> Accordingly, it is concluded there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment.

---

[10]Alternatively, the ALJ determined that Hesla's previous marriage disqualified her from eligibility for CIB benefits. AR 19.

AR 17-19.  The Appeals Council affirmed the ALJ's finding that "prior to age 22, there were no medical signs or laboratory findings to substantiate that the claimant had a medically determinable impairment."  The Appeals Council, however, reversed the ALJ's finding that Hesla's previous marriage precludes her potential entitlement to CIB.  AR 5.  The Appeals Council therefore affirmed the ALJ's denial of Hesla's claim for Title II disability benefits.

### 5.    **The Parties' Positions**

Hesla asserts "the ALJ err[ed] in ignoring the uncontroverted opinions of Dr. Bean and Dr. Tidd which establish that [she] has severe psychological impairments, including anxiety and personality disorders, with an onset date prior to her 22nd birthday[.]" The Commissioner asserts her final decision, which determined Hesla was not disabled prior to her 22nd birthday within the meaning of the Social Security Act, is supported by substantial evidence and free of legal error.

### 6.    **Analysis**

Although Hesla claims lifelong disability caused by anxiety and depression, the first time she sought medical treatment for either of those conditions was in 1984--eleven years after her twenty-second birthday.   The Commissioner found that Hesla failed to carry her burden to show she was disabled at any time before she reached her twenty-second birthday.  The task before this Court not to determine  whether it would make the same decision, but whether there is substantial evidence to support  the  Commissioner's  decision.    "If  substantial  evidence  supports  the  Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports a contrary outcome." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  It is the also Court's duty, however, "to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983).  If the decision is based on an incorrect application of the law, it must be reversed.    *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998).

A.   **Remand is Required for Proper Consideration of the Expert and Lay Evidence**

Because Hesla did not seek any medical treatment for her anxiety and depression until eleven years after her insured status expired, she relies on the retrospective diagnosis provided by Dr. Bean to establish the date of onset of her disability.  Bean's diagnosis was supplemented by the lay testimony of Hesla's family and friends.

"Once the diagnosis is established but the severity of the . . . condition during the relevant period is unanswered, the claimant may fill the evidentiary gap with lay testimony.  The ALJ may consider this evidence, even if it is uncorroborated by objective medical evidence. Under this standard, the ALJ's credibility determination of the lay witnesses becomes critical because the ALJ is, of course, free to believe or disbelieve any or all of the lay witnesses." *Grebnick v. Chater*, 121 F.3d 1193, 1199 (8th Cir. 1997).  Although a physician's retrospective conclusions may accurately state that a claimant manifested symptoms prior to the expiration of her coverage period, if the physician's records do not support his conclusion that the claimant was disabled during that time, the ALJ may properly reject the retrospective diagnosis. *Id.*

The ALJ is free to (1) accept or (2) reject as not credible lay testimony offered in support of a retrospective diagnosis. *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995).  The ALJ is not free, however to refuse to consider the lay evidence because there is no supporting objective medical evidence for the relevant time frame.  That is exactly what the ALJ did in this case.  In *Basinger v. Heckler*, 725 F.2d 1166 (8th Cir. 1984) the Eighth Circuit explained the interaction between expert and lay evidence:

> Only the severity of [claimant's] degenerative condition during the period of his insured status was left unanswered by the medical evidence.  [Claimant] sought to fill this evidentiary gap through subjective evidence; the testimony of himself, his wife, and the affidavits of relatives and friends.  The subjective testimony of the claimant, his family and others must be considered by the administrative law judge even if it is uncorroborated by objective medical evidence.
>
> Where proof of a disability depends substantially upon subjective evidence, as in this case, a credibility determination is a critical factor in the secretary's decision.  Thus,

20

the ALJ must either explicitly discredit the testimony or the implication must be so clear as to amount to a specific credibility finding.

[Claimant] should not have his claim denied simply because he failed to see a physician near the time his insured status expired. The testimony indicated [claimant] rarely sought medical attention throughout his lifetime. . . .A Social Security claimant should not be disfavored because he cannot afford or is not accustomed to seeking medical care on a regular basis. The failure to seek medical attention may, however, be considered by the administrative law judge in determining the claimant's credibility.

*Id.* at 1170.

Dr. Bean provided an expert opinion in the form of a lengthy "Social Security Psychiatric Evaluation" (AR 221-254) but was also her treating physician for at least three of her inpatient hospitalizations. To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). The ALJ is "not required to believe the opinion [of the] treating physician, when, on balance, the medical evidence convinced him otherwise." *Rogers v.Chater*, 118 F.3d 600, 602 (8th Cir. 1997). These same standards apply to a retrospective opinion offered by the treating physician. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002).

The ALJ gave "little weight" to Dr. Bean's retrospective diagnosis because it was not supported by contemporaneous treatment records for the relevant time frame. Grebnick instructs that in such circumstances, the claimant may "fill the gap" with lay testimony, even if such testimony is uncorroborated by objective medical evidence. Hesla provided lay evidence, but the ALJ rejected the lay evidence out of hand as "irrelevant in the analysis of establishing the existence of a medically determinable impairment."

The ALJ . . .failed to discuss the provocative medical diagnoses suggesting an impairment during the insured period, and he likewise failed to discuss potentially corroborating evidence from relatives who knew [claimant] from before [the] alleged onset date to the end of his insured status. The ALJ may have considered and for valid

21

reasons rejected the retrospective diagnoses and the evidence proffered by family members; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ and must be set out in the decision . . .we cannot speculate whether or why an ALJ rejected certain evidence. Accordingly, remand is necessary to fill this void in the record.

*Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995).

The ALJ's refusal to properly consider both the lay evidence and Dr. Bean's opinion was based upon an incorrect application of the law. Pursuant to *Jones* the Commissioner's decision to deny Hesla benefits, based on an incorrect application of the law, prevents this Court from determining whether the denial is based upon substantial evidence. Reversal and remand to the agency for further proceedings is required.

## CONCLUSION and ORDER

For the reasons more fully explained above, IT IS ORDERED:

(1)    The decision of the Commissioner is REVERSED and REMANDED for further proceedings consistent with this Memorandum Opinion and Order;

(2)    A Judgment shall be entered this date in accordance with this Memorandum Opinion and Order.

Dated this 28th day of March, 2013.

BY THE COURT:

Lawrence L. Piersol
United States District Court Judge

ATTEST:
JOSEPH HAAS, Clerk

By. Summa Wahufa Deputy

22